ROSE GILLESPIE, Respondent, *v.* IDA ROSENBAUM, Appellant.

(Supreme Court, Appellate Term, First Department, January, 1919.)

Brokers — when not entitled to commission — evidence — when motion to dismiss complaint granted.

Where no contract of sale has been consummated, a broker employed by the owner of real property to find a purchaser at a price set by the owner is not entitled to the agreed commission, if, after learning that the prospective purchaser is willing to pay the asking price, he submits to the owner a lower figure and urges its acceptance and later submits an offer of the price demanded by the owner.

The evidence in an action to recover the agreed commission considered, and *held,* that a motion to dismiss the complaint, made at the close of plaintiff's case, should have been granted and the judgment entered in her favor will be reversed and the complaint dismissed.

APPEAL by defendant from a judgment of the Municipal Court of the city of New York, borough of Manhattan, fifth district, in favor of plaintiff and against the defendant for the sum of $645.20.

Jesse S. Epstein (Wm. C. Robeson, of counsel), for appellant.

Samuel C. Steinhardt, for respondent.

WEEKS, J. The main question presented upon this appeal is whether a real estate broker, who is employed by the owner of property to find a purchaser at a price set by the owner, is entitled to the agreed commission if, after learning that the prospective purchaser is willing to pay the owner's asking price, he submits to the owner a lower figure and urges its acceptance and later submits an offer of the price demanded by the owner, in a case where no contract for the sale is consummated.

The plaintiff's assignor testified that on May first he met the defendant in the street and asked her if she would sell a certain piece of property and at what price; that she said she would sell it for $60,000, that it was free and clear, and that he told her he would see if he could get a customer for her; that he called on the rector of a church which adjoined the property in question and told him the price fixed by the owner and obtained from him an offer of $45,000, which he submitted to the owner and in the language of the witness " She kind of felt put out that I should make her such an offer. Well I told her that I submitted that offer because it was given to me by my client. She said her price was $60,000; she would not take any less."

The broker further testified that in September he submitted an offer of $50,000, and the owner again

refused, stating her price was the same; that later he submitted offers of $53,000 and $55,000, both of which were rejected; that the rector of the church then sent for him and told him " that he would buy that property. He did not think it was worth that much money but * * * that he could get $30,000 from some friend of the church that he could invest in that property and I should see if I cannot get that property, and he told me to offer $57,500 to split the difference; and he said ' You do the best you can. I will leave it with you. You try and fix the matter up. This is a matter of $30,000 that is involved here with me and I want to get this money. * * * He said we will pay the $60,000. You go ahead and fix it up the best way you can.' Q. Did you say anything about the arrangement of mortgages? A. No, we didn't then say anything, but he said you arrange it and we will fix it up."

This conversation took place on December twenty-sixth and on December twenty-ninth the broker again met the owner on the street and according to his testimony the following conversation took place: " I said ' Well Mrs. Rosenbaum why don't you take up that offer. I think it is a good offer. Why don't you sell it?' And she said, ' No, my price is $60,000 and I wouldn't take any less.' And I said, ' Well won't you take — can't we split it? Won't you take $57,500.' And she said, ' No, no I won't take any less,' and I said, ' Well now come and let us do business together, we are close enough,' and she said, ' Well $60,000 is my price and I won't do anything. I won't take any less.' And I said, 'All right we will close it up, we will give you the $60,000. What arrangement can we make about the mortgage? Will you take ten or fifteen thousand dollars cash?' And she said, ' Well, about that, you talk to Morris Blumenthal about that and he will arrange about the mortgage.' "

Upon cross-examination the broker testified referring " First off I asked her if she would not take the offer that I had made. And then I offered her fifty-seven five and then sixty. Q. Now this was after you had seen Mr. Wade and he told you to go to $60,000? A. Yes. Q. And after he told you that, you went back to Mrs. Rosenbaum and you asked Mrs. Rosenbaum to split between fifty-five and sixty? A. Yes. Q. You didn't tell her first that you had this offer of sixty thousand dollars? A. No, I didn't tell her right away. Q. You were asked to get the property for Mr. Wade as cheap as you could get it? A. That is right. That is all I wanted to do."

On re-direct examination he testified: " Q. Mr. Wade had said to you that you were to offer fifty-seven five, and if you couldn't get that, to go to sixty. A. Yes, sir."

The broker also testified that a few days later, in the first part of January, after calling at least twice, he saw the lawyer and told him that he had spoken to the owner about the mortgage and had been referred to him, "And I said, ' would $15,000 be enough?' And he said to me, ' Well I think if you make it twenty, I think it would be all right * * *.' He told me he would speak with Mrs. Rosenbaum over the phone * * * that I should come back later; " that when he returned he was told that the owner had decided not to sell the property.

The broker admitted that he had never disclosed to the owner the name of the prospective purchaser.

The rector of the church, the prospective purchaser, testified that he authorized the broker to offer $60,000 and was able, ready and willing to purchase the property at that price, $20,000 to be paid in cash and $40,000 to remain on mortgage.

On cross-examination he testified that about January

third he was informed by the broker that the amount of cash that would be required was $20,000; that up to that time there had been no discussion as to the amount of cash and the amount of mortgage; that they would have paid $30,000 in cash if necessary; that the property was first brought to his attention on May thirty-first and the price was $60,000; that they offered forty-five, fifty, fifty-three, fifty-five, fifty-seven and a half, " and I told Mr. Goldsmith ' You may as well close it up at sixty.' Q. Did you ever say to Mr. Goldsmith ' Say fifty-seven five, and if he won't take it go to sixty?' A. Yes. Q. That is he was acting for you in that respect? A. Yes, sir. Q. Had you promised him anything for serving you in that way? A. Absolutely nothing. Q. But your understanding was that he was to get the property just as cheap as he could get it? A. Yes."

On re-direct examination he testified: " Q. Mr. Goldsmith was not authorized to offer $60,000 until he had offered $57,500? A. No, sir. Q. Is it not correct that you said to Mr. Goldsmith to arrange the mortgage the best he could? A. Yes, I gave him a free hand."

With this testimony the plaintiff rested and defendant made a motion to dismiss the complaint upon the ground that on the plaintiff's own testimony he was employed by the defendant to serve her and his own proof was that he was serving the purchaser and endeavoring to get the property as cheap as he could for the purchaser. This motion was denied and defendant duly excepted.

The defendant testified that the broker never submitted to her any higher offer than $55,000 and her lawyer testified that he had never heard of any higher offer than that amount, but that the broker on January second had stated to him that he thought he could get

$57,500, but that he could not get $60,000, and that he told the broker he would telephone to the owner that she might be able to get $57,500; that he did so and she rejected the offer and directed him to tell the broker that the property was out of the market; that he then notified the broker that the property was withdrawn from sale; that the broker had never told him that he had a purchaser at $60,000 and that there was never any conversation between them about the amount that could remain on mortgage in the event of a sale, except that if he was asked by the owner for his opinion he would say that sixty per cent would be fair.

The trial court in its opinion stated that upon the facts it found in accordance with the plaintiff's version and while we have serious doubt as to whether such finding is not against the weight of the evidence we should be loath to disturb the judgment upon that ground alone.

The plaintiff, however, upon the testimony of her assignor was not entitled to recover. He claims that he was employed to secure a purchaser for defendant's property at a price which she fixed, and she was entitled to the benefit of his services exerted to the best of his ability to secure that price, and she was also entitled to be informed by him of any knowledge which he acquired in connection with his employment which would be of service or advantage to her. At the time of his employment there was no agreement that any part of the purchase price was to be left on mortgage and that question was not taken up until after the broker claimed that he had submitted the offer of $60,000.

He never advised defendant that the proposed purchaser was the owner of the adjoining property nor that the proposed purchaser was able to pay $30,000 in cash. Both of these facts were matters which his

38

employer was entitled to know and were material elements to be considered by the owner in reaching a determination as to the wisdom of selling the property at a lower figure or in determining the amount of money to be left on mortgage in the event of a sale. When the broker was told by the proposed purchaser " to offer $57,500, to do the best he could, that they would pay $60,000 and to go ahead and fix it up the best way he could " and was told " to arrange the mortgage and they would fix it up," he was then under a duty to so inform his principal. Instead of doing so he testifies that he urged the owner to accept the offer of $55,000 which he had previously submitted and told her that he thought it was a good offer. This was a most flagrant breach of faith and clearly shows that at that time his services were not being rendered to her, but to the purchaser. He had then clearly undertaken to " fix it up " for the purchaser rather than to secure for the seller the price which she asked, and it is not necessary for the defendant to establish that any immediate pecuniary gain was to accrue to the broker from the purchaser in order to demonstrate his bad faith. He is convicted out of his own mouth. One cannot serve two masters whose interests conflict, and when he enlisted in the service of the purchaser he surrendered his right to claim compensation from his former employer. He knew that the purchaser was willing to pay the price asked and possessing that knowledge he should have told the purchaser that his duty to his employer prevented him from concealing that fact and submitting a lower offer. He preferred, however, for some reason evidently satisfactory to himself, to represent to the seller, in whose employ he claims to have been at the time, that he thought $55,000 was a good offer. This was not merely a supression or concealment. It was a deliberate false-

hood uttered for the purpose of inducing his employer to act contrary to her own interest. Nor did his bad faith cease there, for, according to his own testimony, he concealed the fact that the purchaser was prepared to pay $30,000 in cash and asked the owner if she would take $10,000 in cash and when he visited the lawyer he again endeavored to secure the property for the purchaser with a cash payment of only $15,000.

It is clear that in so dealing with the owner he considered the purchaser to be, as he himself described it, his " client."

Having failed in his duty to his employer the broker forfeited his right to compensation and the motion to dismiss the complaint made at the close of the plaintiff's case should have been granted.

The judgment must, therefore, be reversed with thirty dollars costs of the appeal and the complaint dismissed with appropriate costs in the court below.

GUY and MULLAN, JJ., concur.

Judgment reversed, with costs.